AUTOMATIC TOTALISATORS, INC. *v.* UNITED STATES

No. 4604.—Invoices dated Sydney, Australia, October 24, 1931; September 24, 1932; October 2, September 30, 1931.
Entered at Miami, Fla., December 2, 1931; October 27, 1932; November 17, 12, 1931.
Entry Nos. M–164, M–74, M–147, M–138.

(Decided June 15, 1939)

*S. Pierre Robineau* for the plaintiff.

*Webster J. Oliver*, Assistant Attorney General (*William H. Futrell, John F. Kavanagh, Charles J. Miville, Daniel I. Auster*, and *William J. Vitale*, special attorneys), for the defendant.

BROWN, Judge: This appeal to reappraisement tried at Miami, Fla., involves the dutiable value of a so-called totalisator machine

imported from Australia. It was designed to operate and record the betting at American race tracks under the pari-mutuel system. It might be called a sporadic importation, none ever having been imported to America before or since. It was manufactured on special specifications peculiar to the American betting system which includes three places instead of two in England, Australia, and other countries and under a different currency system which prevents the same thing from being sold in the home market place.

There was a full and open disclosure of facts between importer and Government and no dispute as to amounts of items. It is claimed and asserted, in this situation, that under the decisions of the courts there is no legally usable foreign-market value or export value or United States value and that appraisement must be had on a cost of production basis. Also the figures upon which the purchase price was arrived at and upon which entry was made are not in dispute except for the advance made by the appraiser of 8 per centum for profit. If they are to be considered as costs and not the purchase price which they are; the undisputed figures include overhead of more than 10 per centum and everything else.

This the sole advance is disputed by the importer upon the ground that the machine largely consists of parts made by subcontractors whose individual profits each amounted to more than 8 per centum, as the record shows. It is, therefore, claimed that to add the 8 per centum profit would be a double addition for profit and, therefore, arbitrary and not permissible.

With this contention of the importer we cannot agree as the cost of production formula, always more or less arbitrary and uncertain in its nature, intends to treat the shipper who does more than mere assembling as the manufacturer, as the very substantial cost shown by this record as incurred by the shipper in assembling and putting together and adjusting the various parts indicates, even if that does result in duplicating the profits of the subcontractors.

However, we do not consider this is a case for the application of the so-called cost of production substituted value for the reasons set forth hereafter.

The undisputed testimony in the case shows—

(1) that the machine sold to Automatic Totalisators, Înc., was the first of its kind ever made by Automatic Totalisators, Ltd., of Australia. It was quite unlike other machines sold or offered for sale by Automatic Totalisators, Ltd. It was singularly adapted to the particular use by the American company;

(2) the machine could not be used in Australia or in any other continent than North America, it being particularly manufactured for use under the North American system of wagering;

(3) the machine was made for the American company according to special specifications supplied by that company and as supplied could not be used for home consumption in Australia. The form of wagering on this machine which provides for three different pools is only used in North America and the form of dividend calculation is different. This machine, therefore, is quite unlike the machines used in other countries;

(4) that the sales price, which is the entered value, was arrived at after negotiation and dickering.

Although the portions are shipped in four shipments with as many invoices there is in reality one sale here of one totalisator machine. This was in fact an isolated sale for export from Australia to the United States at the invoiced and entered value after negotiation and dicker as to the *price*. The contract under which it was sold made the importing company the sole party in the United States to whom, for the period of the contract, future machines were to be sold, but no more were sold.

By supplemental contract the price was to vary with variation in costs of material and costs of labor. The Australian shipper chose to sell at what he called "cost" looking for most of his future profits to royalties to be paid for its future use in America, much of it being patented.

Such royalties have frequently been held not to constitute part of the customs dutiable value of an importation. That is not contested. *Tidewater Oil Co.* v. *United States*, T. D. 44538; *United States* v. *Leigh* (CC Mass. 1889) 39 Fed. 764; also *United States* v. *Tidewater Oil Co.*, 19 C. C. P. A. 392, T. D. 45554.

There were no further sales of these machines made, or imported, under the construction contract. This, consequently, comprises one individual isolated purchase. A single negotiated purchase, ordered constructed on particular specifications, for a particular use, stands in a class by itself.

It is unlike a commodity, say cloth or an article of general use. It is, in its very nature, incapable of being offered for sale to all purchasers as an ordinary article of commerce is. Many thousands of such special articles under the old definitions of home market value in the act of 1913 and previous acts were appraised nevertheless upon the price for which they were specially constructed (their purchase price), both by the administrative customs officials and by this court on reappraisement appeal. The following are instances of this:

In "Machinery and Parts," *United States* v. *Niagara Ammonia Co., Inc.*, December 3, 1926, per Fisher, J., affirmed a decision by Waite, J., that the price paid for a single piece of machinery was the dutiable value. Decision 312, Volume of Reappraisement circulars covering Jan.–Dec. 1926, page 245.

In reappraisement circulars of September 29, 1916, Reap. Dec. 27013, Judge Fisher said in part:

These machines are specifically made according to specifications and the prices charged are the only prices which can be said to constitute market value.

In reappraisement 35486, Circular Volume Jan.–Dec. 1925, decided February 16, 1925, in circular of March 2, 1925, Judge McClelland sustained the purchase price of machines which "not being used became rusty and covered with dirt," and which were afterwards renovated. They seem to have been single purchases by themselves with nothing much before the court except the purchase price.

In T. D. 44257 reporting the reappraisement case on Gypsy aircraft engines, *Receivers of the Central Vermont Railway Co.* v. *United States*, 58 Treas. Dec. 286, decided September 19, 1930, Judge McClelland concludes his opinion in these words:

I find as a fact that the engines in question were in several respects inferior to the Gypsy aircraft engines of more recent production, which on the date of exportation of these in question were being sold in England for $1,275 each, and I am satisfied that the purchase of the machines by the president of the importing company was a straightforward purchase and sale for cash, and that $1,150 for each was their full foreign value.

In *Lloyd Co.* v. *United States*, 9 Ct. Cust. Appls. 283, T. D. 38217, in dealing with sample books sold for cost by the foreign manufacturer showing the particular differing designs sent to each American purchaser for distribution to their customers selling at retail Judge Martin said:

In such a case a single actual buyer would become a "market" for the merchandise in contemplation of law.

See also *United States* v. *Glendinning McLeish & Co., Inc.*, 12 Ct. Cust. Appls. 222, T. D. 40229, where a price paid without more on a negotiated sale was held to govern.

In *M. J. Corbett & Co., Inc.* v. *United States*, T. D. 45965, 62 Treas. Dec. 418, 20 C. C. P. A. 178, Judge Graham says:

One sale may establish export value if all the statutory requirements have been satisfied. *United States* v. *Malhame & Co.*, 19 C. C. P. A. (Customs) 164, T. D. 45276.

The reason why such individual specially constructed purchases are now claimed to be appraisable upon "cost of production," with their purchase price ignored in finding customs value, seems to be based upon the erroneous assumption that when in the acts of 1922 and 1930 Congress sought to procure more customs duty, in addition to raising the rates, by dividing foreign-market value into home consumption value and export value and providing that the importer should pay duty upon whichever was higher, Congress was also incidentally relegating all such specially constructed articles to appraisement on "cost of production," for the first time.

Some modern appraisements relegating them to cost of production since the act of 1922 rest primarily upon the expression in all customs definitions reading "freely offered for sale to all purchasers." Yet that expression has been in the law for a century or more. It was taken from the language used by the Supreme Court in the famous old champagne case.

It never forced isolated, specially constructed articles like this totalisator machine to be appraised upon "cost of production" until after the division into home consumption sales and export sales by the act of 1922.

Those words are inserted in customs value definitions to insure that the importer of an article of general consumption does not get it appraised on importation at a value at which he luckily *purchased below the market* for usual purchasers of such freely sold goods. They naturally have no application whatever to an isolated, specially constructed article such as this. There the importer cannot get it in below the market for the entire market consists of his purchase alone.

Where the facts and circumstances take a particular case out of the rule the reason for the rule and the application of the rule depart.

In such cases it was always formerly considered Congress intended that the purchase price negotiated after dickering should determine the dutiable value.

Cost of production was properly considered usable only when there were no sales whatever anywhere when the merchandise was consigned for use in his home or factory by the importing consignee. It never was an accurate value, or even professed to be, but merely a method with arbitrary statutory additions constructively for *approximating* foreign-market value when no sales or offers of sale abroad or here were available to be used for determining customs value. If its use is now to be expanded to cover a new and large class of articles like the article before us that is going to add enormously to the difficulties and uncertainties of foreign trade. This radical change was very far from the thought of Congress when it simply divided up foreign value into two parts and provided that duty should be paid upon whichever part was higher. The effect of the change should be limited to its expressed purpose and the old expressions repeated in the new change should not be used for making appraisements in a large class of new importations by cost of production as if it were a substantive value definition instead of a mere dernier resort when all sales and offers to sell either here or abroad were completely lacking.

It is perfectly plain to the writer that now as under the former acts Congress intended the negotiated purchase price of articles made under circumstances like these to measure the ad valorem duties.

Cost of production is a very uncertain, indefinite thing. The only reason the cost figures upon which the purchase price was here based

seem certain and accurate is that they were accepted here as accurate by both sides. The American consul, after an investigation, approved them all, including the high overhead charge much higher than 10 per centum.

The late Thomas Walker Page, for many years Chairman of the Tariff Commission, was probably the greatest tariff expert the United States ever produced. In his book "Making the Tariff in the United States" (1924), chapter IV, pages 83 and 84, he says:

There is much misunderstanding as to what cost accounting can really show. It is true that no manager of any considerable and well-conducted business to-day fails to record the costs of the business and to make some analysis of them. He finds it desirable to do so in order to stop leaks, to promote efficiency, to exhibit the net profits of the enterprise, and for other purposes. There is a popular assumption that the records thus kept will accurately disclose the cost per unit of the products turned out. In fact, however, this is seldom the case.

A multitude of questions arise * * *. Shall the materials used be valued at their market price, or at what it actually cost to produce them? Shall interest be allowed on the value of plant and equipment; and if so, is it proper to take the value of the plant as a "going concern", or is it better to take as the value of the estimating cost the outlay of the owners in acquiring and improving it? Such questions suggest that costs can be made to seem either high or low by the system of accounting which is followed. It might be possible in time to standardize the system and thus in a somewhat arbitrary way to reach a cost per unit of product in some industries that consist of simple and independent processes resulting in a single product. But such industries are relatively few. Modern industrial processes are commonly so organized and integrated that they contribute jointly to the completion of a number of different commodities. The accountant is usually faced, therefore, with the problem of joint costs, and the solutions accepted are purely arbitrary and differ widely from one plant to another.

Add to that the necessarily arbitrary statutory minimum additions to get from the factory to the foreign-market place and we have such an indefinite, arbitrary thing that it is impossible to suppose that Congress intended it to be used for dutiable value in place of the purchase price of the article itself the amount of which is admitted. The latter is a perfectly definite and certain amount arrived at after negotiation and dickering. It was the purchase price of an odd machine made on particular specifications only one of which was ever made or imported.

It is a confusion of terms to talk about a closed market concerning a single manufacture like that, no matter what the terms of the contract were about subsequent machines which were never ordered, manufactured, or sold. It would be a strained construction indeed to throw this negotiated sale's price out because of the words "freely offered for sale" in the statute, which in the circumstances cannot apply to it and substitute the arbitrary guesswork formula called cost of production. Congress never intended such an absurd result.

See also a discussion of these two arbitrary, uncertain constructive emergency values in the case of *Zellerbach Paper Co. (Hoyt, Shepston.*

*and Sciaroni*) v. *United States* on matrix board, decided June 14, 1939, Reap. Dec. 4603.

For the above reasons judgment will therefore issue sustaining the entered value, which is the export sales price, as the dutiable export value.